Julia Sharkey, Appellant, *v*. Thomas McDermott, Administrator, Respondent.

June 17, 1884.

1. Equity — Adoption — Parent and Child — Oral Contracts. — After the death of a husband and wife, equity will not give effect to an oral promise by them to adopt the plaintiff as their child.

2. —— Married Women. — After the death of a married woman, equity will not give effect to her oral promise, made during coverture, to adopt a child.

3. —— An adopted child of the husband does not by reason of such adoption become the heir of the wife.

4. —— An oral contract which will operate after death as a disposition of the estate must be such as was mutually enforceable during the lives of the parties.

5. —— The performance of such a contract by the claimant must have been in sole consideration of the contract and have been referable to no other consideration.

Appeal from the St. Louis Circuit Court, Barclay, J.
*Affirmed.*

M. F. Taylor and F. M. Estes, for the appellant: There may be an adoption by parol. — *Hill* v. *Goumel*, 1 Beav. 541; 53 Iowa, 146; 25 Ga. 612. An intended contract, ineffectual as such by reason of some formal omission required by law, may generate an estoppel when a manifest fraud would result from treating the whole transaction as wanting in validity. — Big. on Estop. 489–492; *Dukes* v. *Spangler*, 35 Ohio, 126; *Jeffers* v. *Philo*, 35 Ohio, 173; *Sutton* v. *Hayden*, 62 Mo. 101; *Gupton* v. *Gupton*, 47 Mo. 37. The defendants being

privies of Catherine McLaughlin are estopped to deny that plaintiff was legally adopted. — *Van Dyne* v. *Vreeland,* 3 Stockt. 370; *Van Dyne* v. *Vreeland,* 12 N. J. Eq. 142.

BROADHEAD & HAEUSSLER and C. V. SCOTT, for the respondent: Adoption must be by formal deed. — Rev. Stats., sects. 559–601. Courts of equity can not dispense with the regulations prescribed by statute; otherwise equity would, in effect, defeat the legislative enactment. — Story's Eq. Pl., sects. 96–170; *Long* v. *Hewitt,* 44 Iowa, 363; *Houck* v. *Bates Co.,* 61 Mo. 391. The alleged promise, if · made, was the agreement of James McLaughlin solely; Catherine, a married woman, was incapacitated in law to contract in the respect alleged, and any promise by her, as alleged, being void, no ratification was made when discovert. — *Kernan* v. *Martin,* 8 Mo. 698; *Musick* v. *Dodson,* 76 Mo. 627. Any right of action plaintiff might have had at the death of James McLaughlin, in 1876, is barred by laches and the statute; when the facts disclose laches the court will refuse relief. — *Kelley* v. *Hurt,* 74 Mo. 561; *Godden* v. *Kemnen,* 99 U. S. 211; *Sullivan* v. *Railroad Co.,* 94 U. S. 807

THOMPSON, J., delivered the opinion of the court.

I. The respondent makes the point at the outset, that there is nothing before the court to consider, because the motion for new trial was not made within four days after the entry of the judgment. No motion for new trial is necessary to raise the question upon which our judgment is invoked, whether the petition states a cause of action, which question is presented by what is termed the record proper. Besides, the bill of exceptions states that the motion for new trial was filed within four days of the judgment; and this, although contradicted by the clerk's minute entries copied into the transcript, is controlling. *Bank of North America* v. *Fletcher,* 15 Mo. App. 272.

II. The question for consideration arises upon a demurrer to the following petition : —

" Plaintiff states that Thomas McDermott is the administrator of the estate of Catherine McLaughlin, deceased, duly qualified and now in the discharge of his duties as such ; that defendants Margaret and Charles Mileham are husband and wife; that defendants Andrew and Mary Hanson are husband and wife, and defendants Thomas and Annie McDermott are husband and wife, all of said defendants living together as husbands and wives as aforesaid; that the other defendants and this plaintiff are the only heirs at law of the said Catherine McLaughlin, deceased, as well as of her late husband, James McLaughlin.

" Plaintiff further states that the said Catherine died heretofore, to wit, on or about the 15th day of January, 1883, leaving a large estate situated in the city of St. Louis, State of Missouri, and consisting of both personalty and realty, which she took under the will of her husband James McLaughlin, deceased ; that said Thomas McDermott has in charge such of the personalty as has been discovered, and also is, by order of the St. Louis probate court, collecting the rents of the real estate. Plaintiff further states that, when she was an infant of about the age of four years, and to wit, on or about the first day of January, 1862, said James and Catherine McLaughlin took this plaintiff from her mother's care, her father having previously deceased, and placed her in their household, promising plaintiff's mother that they would provide and care well for her, and adopt her as their child, and leave her their property at their death. That from that time on until the death of the said James, to wit, about the year 1876, this plaintiff continued to reside in their household, was told by said James and Catherine that she was their legally adopted child, and would inherit their property; that so soon as she was large enough to work she was put out at service in a

store in the city of St. Louis, all of her wages being collected and appropriated by said James and Catherine; that she yielded a willing obedience to the said James and Catherine under the impression that she was their legally adopted child; that after the death of said James, and the publication of his will, it was ascertained that he had willed to this plaintiff one-half of his whole estate, but afterwards, by codicil, revoked the bequest, leaving his entire estate to the said Catherine, the property so willed being all that the said Catherine died seized and possessed of; that plaintiff was informed by the said Catherine, and avers the fact to be, that said codicil was written because the said James feared that, becoming independent by reason of said bequest, plaintiff might refuse to longer recognize the relationship of adopted child, and leave the household and society of the said Catherine; that, after the death of said James, plaintiff still continued under the same conditions to live in the household of the said Catherine; that she was by the said Catherine held out to the world as her adopted child, and was by said Catherine repeatedly told that she was her legally adopted child, and would inherit, by reason thereof, all of her property. Plaintiff further states that the defendants were all of age prior to the death of said Catherine, and all resided in the city of St. Louis, Missouri, and were visitors at the house of said Catherine, and had full knowledge of the relationship existing between said Catherine and plaintiff, and were frequently told that plaintiff was her adopted child, and the expectations of plaintiff the defendants acquiesced in and acknowledged. Plaintiff states that, after the death of said James, she still continued in said service in a store in the city of St. Louis aforesaid, the said Catherine receiving and appropriating all of her wages; that she also did all of the sewing and other household labor for said Catherine, and continued to live with and serve said Catherine, discharging for her all of the duties commonly discharged by a child for its parent; that from the time she

first began to work in a store, as above mentioned, until the death of said Catherine, she earned as wages the full sum of $5,000, all of which was received and enjoyed by said James and Catherine, and that her services in the household were worth more than the board, lodging and clothing given her; that she rested secure during all of said years in said relationship, yielded all of the affection and obedience due from a child to a parent, at all times supposing from the statements of the said James and Catherine that all legal requirements had been complied with, and that she was their legally adopted child and heir; that of the said sum of money so received from her labor as aforesaid, $2,500 came into the hands of and was appropriated by said Catherine after the death of said James.

"Plaintiff further avers that said Catherine was seized with a spasm and died suddenly while plaintiff was engaged in attending to her duties as saleswoman as aforesaid, never speaking after she was taken with said spasm, and that, after her death, it was found that she died wholly intestate, and plaintiff then, for the first time learned upon investigation that no formal statutory deed of adoption was upon record as provided by law, and as to whether any deed was ever formally executed plaintiff has now no means of knowing; that when she was taken as aforesaid into said household she was of too tender an age to require a formal deed, and, after growing older, trusted entirely to the statements of the said James and Catherine that said requirements had been complied with, and did not know anything to the contrary.

".Plaintiff further states that the defendants, as heirs at law, and as administrator of said Catherine, now deny her right to said property as the adopted child of said Catherine; deny that the facts and circumstances herein before detailed constitute any reason why she should be held and considered as an adopted child, or that said property, both real and personal, should be turned over to her, and

threaten to take and appropriate the estate of said Catherine to themselves.

" Plaintiff alleges that, after having contributed the earnings of the best years of her life and a long service at home to the said James and Catherine during their lifetime, under the conviction that she was their adopted child, and that she would receive from them their property at their death, to be now deprived of the fruits of such adoption and the benefits of said estate to which she has herself contributed, and to be set aside and debarred from sharing the estate of said Catherine as if adopted, and to be deprived of the large sum of money received by the said James and Catherine on account of her services, as aforesaid, would be a gross fraud and great hardship, and that, in equity and good conscience she is entitled to be treated in the distribution of said estate, and by the heirs at law of said Catherine, none of whom are her children, as though a formal deed of adoption had been signed and recorded as provided by law.

" Wherefore plaintiff prays that a decree be herein entered establishing her right of adoption, and declaring her the heir at law by virtue of the adoption of the said Catherine, and the heir at law by reason of the said premises, and for all other and further relief as the facts in the case may warrant and the court deem proper."

We are of opinion that the circuit court rightly sustained the demurrer to the petition. It will be perceived, that in substance it invokes the aid of a court of equity to establish by parol evidence an agreement by which it is alleged that James and Catherine McLaughlin promised to adopt the plaintiff as their child and heir at law. It seeks this relief after both of the parties who are alleged to have made this promise have died. It seeks it seven years after James McLaughlin died, the plaintiff having been, at the date of his death, eighteen years of age, and capable of bringing her action then. So far as the petition attempts to found a right of action upon any promise made by Catherine

McLaughlin while under coverture, it is bad ; because it is
settled in this state that a married woman can make no con-
tract except where some enabling statute empowers her to
do so ; that a promise made by her is a nullity ; and that it
does not even furnish a consideration for a subsequent
promise made by her after she becomes discovert.   *Musick*
v. *Dodson*, 76 Mo. 624.   There is no averment in the peti-
tion that Catherine McLaughlin ever made a promise to
adopt the plaintiff after Catherine McLaughlin became dis-
covert by the death of her husband.   On the contrary, the
petition indicates that both Catherine and the plaintiff sup-
posed that she had been formally adopted ; so that, what-
ever foundation the petition affords for the relief sought
must be predicated upon the alleged promise of James
McLaughlin to adopt the plaintiff.

Our statute (Rev. Stats., sects. 599–601) has provided a
mode by which any person may adopt " any child or chil-
dren as his or her heir or devisee."   This is to be by deed
duly executed and recorded, as in the case of a conveyance
of real estate.   By section 600, a married woman may make
such an adoption by joining in such a deed with her hus-
band.   The rights acquired by the adopted child are thus
stated in section 601 :   " From the time of filing the deed
with the recorder, the child or children adopted shall have
the same right against the person or persons executing the
same, for support and maintenance and for proper and
humane treatment, as a child has, by law, against lawful
parents ; and such adopted child shall have, in all respects,
and enjoy all such rights and privileges as against the per-
sons executing the deed of adoption.   This provision shall
not extend to other parties, but is wholly confined to parties
executing the deed of adoption."   Although section 599
speaks of adopting the child as his or her heir or devisee, yet
it is obvious from the whole statute taken together, that it was
not intended to place an adopted child upon a better footing
in respect of inheritance than a natural lawfully begotten

child would occupy. Suppose then, that James McLaughlin had, in his lifetime, fulfilled his alleged promise of adopting the plaintiff, would it have prevented him from thereafter devising his property to his wife to the disinheritance of this plaintiff? Assuredly not. To hold otherwise would not only place an adopted child in a better position than a real child of the parents, but it would operate to release an adopted child from one of the strongest motives of filial obedience, and deprive the adopting parents of one of the most effective means of enforcing obedience. If then, a court of equity could place the plaintiff in the position in which, according to her petition, James McLaughlin promised to place her, what would that position be? It would simply be the position of a daughter disinherited first by her father, and afterwards by her mother, asking a court of equity to make for her a will which neither her father nor her mother had made for her.

Suppose she had been adopted by James McLaughlin; if he had died intestate she would have been his heir. But would an adoption by James McLaughlin without the concurrence of Catherine McLaughlin make her Catherine McLaughlin's heir? Can a man by adopting the child of another change the statute of descent and distribution in respect of his wife's property? It seems unnecessary to ask such a question. In many cases, courts of equity will give effect to agreements imperfectly executed, or resting only in parol, where they have been in part performed; but it is well settled that such courts will not in this way aid the defective execution of a power created by statute. The reason is that for them to do so would defeat the very policy of the legislative enactment. 1 Story's Eq. Jur., sect. 177; *Houx* v. *County of Bates*, 61 Mo. 391; *Long* v. *Hewitt*, 44 Iowa, 363. Although this rule may not be of universal application, yet it would be difficult to suggest a case which calls more strongly for its application than the case before us. If such a court could, after a husband and wife are both dead, give effect to a parol promise made in

their lifetime to adopt a child as their own, it could, upon the same principle, break into the statute of wills; a will could be made for an intestate decedent by parol evidence. The party who alone is able to testify as to the real intent being dead, a will could be readily manufactured for him by perjured testimony as to oral declarations or promises made in his lifetime, and all certainty in the devolution of the property of deceased persons would be at an end.

But if such extraordinary relief as is asked in this case could have been afforded against James McLaughlin, in case he had died intestate, it would still be impossible for the plaintiff to have any relief, because her entire claim for relief is predicated upon the idea that, in some way, she is entitled to be regarded as the adopted daughter of Catherine McLaughlin, deceased. Now, James McLaughlin devised all his property to his wife, Catherine McLaughlin. We have already said that, if the plaintiff had been formally adopted as his child, by deed, this would not empower a court of equity to set aside his will for the purpose of enabling her to inherit from him, because such a court could not do that if she were his real child. We have already pointed out, that even if she had been adopted by him, this would not make her the heir of his wife, Catherine McLaughlin. It thus appears that, in order to grant the extraordinary relief which is here claimed, we should have to go to the length of holding, not only that a court of equity can make a deed of adoption for a man after he is dead, but that it can make such a deed for a married woman after she is dead. The general rule is that a married woman can make no deed except where she is empowered to do so by statute; and except in the manner in which the execution of such power is prescribed by statute. This is very familiar law. If a married woman were to make a thousand parol promises to A, founded upon the most meritorious consideration, to make a deed of her property to him, a court of equity could not make such a deed for her, because

this would be in contravention of the statute which has prescribed the manner, and the only manner, in which she can make a conveyance of her real property. For the same reason, the law having empowered Catherine McLaughlin to adopt this plaintiff in one way, namely, in the way pointed out by section 600 of the Revised Statutes, it is too clear for debate that a court of equity could not, if she were living, and for stronger reasons can not now that she is dead, make such a deed for her, or make a decree which shall have the same effect as such a deed.

None of the decisions to which we have been referred by the learned counsel for the plaintiff in support of the proposition that there may be an adoption by parol supports that proposition, and only one of them refers to the question at all, namely, *Tyler* v. *Reynolds* ( 53 Iowa, 146–150 ), where the proposition was not decided, but was said to be "perhaps doubtful at least." In that case there was a statute like ours, which provided the manner in which a person might adopt the child of another, namely, by a deed, duly executed, acknowledged and recorded. The court held that the provision that the deed should be recorded was essential to its validity, and, this not having been done, disregarded the equities of the child, notwithstanding she had entered into the family of the person who intended to adopt her, and had been openly acknowledged to the world as their adopted child. In so holding, the Iowa court followed their previous decision in *Long* v. *Hewitt* (44 Iowa, 363). In this last case, the instrument intended to effect the adoption of an infant had been signed and acknowledged by his surviving parent, but the persons intending to adopt him had failed to execute it by reason of the illness of the justice of the peace in whose possession it had been left. It was held, disregarding the equities of the child, who had resided with the intended parents a year and a half, that there had been no legal adoption. The court proceeded upon the ground that, while equity will

interfere to correct the defective execution of a power, yet it has no jurisdiction to relieve parties from the effects of a failure to execute, even though the intention to do so may be apparent; and further, that they can not aid the defective execution of a power created by statute. "The statute," said Rothrock, J., "provides what shall be necessary to be done in order to confer upon the child all the rights and privileges and responsibilities which would appertain to the child if begotton (to the adopting parents) in lawful wedlock. Courts of equity can not dispense with the regulations prescribed by statute; for otherwise equity would in effect defeat the very policy of legislative enactments. * * * If courts of equity should hold that an inquiry may be made as to what were the causes which prevented a compliance with the statute by the proper execution of an agreement for adoption, it would be a most dangerous doctrine, and would be in effect permitting that which the statute requires should be in writing to be shown by parol; thus allowing estates to be distributed upon what might be shown by parol to have been the intention of the intestate." *Ibid.* 367.

Some observations ought to be made upon the case of *Van Dyne* v. *Vreeland* (11 N. J. Eq. 370; *s. c.* 12 *Id.* 142), which has been pressed upon our attention. In its facts that case was much like the facts set up in the petition in the case at bar; and it was held that a court of chancery had power, the adopting father living, to set aside a fraudulent conveyance of his property made with the intention of defeating his engagement to leave all his property to the adopted son, although the contract of adoption was by parol merely; and the court proceeded upon the ground, which clearly appeared, that the contract had been completely executed by the complainant, the adopted son, which took it out of the statute of frauds. But a striking distinction between that case and this is that there was no statute in New Jersey providing for the formality of a recorded deed

in order to the validity of an adoption, as there is in this state. Moreover, several successive wills had been made by the adopting father, in pursuance of his engagement with the adopted son, in which he had described him as his adopted son. These wills, although revoked by subsequent ones, might be regarded, in so extreme a case, as memoranda in writing signed by the party to be charged, such as would take the case out of the statute of frauds. It is further to be observed that this decision is that of a single judge, Chancellor Williamson, and not that of a court of appeal; and while the learned judge appears to have considered the question very thoroughly, it is not necessary for us to say whether, in the absence of any statute relating to the adoption of children, we should regard it as a sound decision. I feel disposed to place it, where the supreme court of Iowa placed it, in the category of doubtful decisions; and this, notwithstanding the learned chancellor, in his second opinion (12 N. J. Eq. 144) expressed the opinion that all the essential grounds of his first opinion had been approved by as eminent an equity judge as Lord Langdale, M. R., in *Hill* v. *Gomme* (1 Beav. 540). It does not seem necessary to consider at length the decision of Lord Langdale in that case; because, admitting it to have been well decided, it is no authority for what the plaintiff contends for in this case. The contract between the father of the child and the adopting father in that case was by deed, and there was a present consideration of £100 paid by the former to the latter. Nor does it appear that there was in England any statute prescribing the formalities essential to a valid adoption of a child, such as exists in this state. Moreover, the decision was against the claim set up by the adopted child, on the ground that the contract had been revoked by the original parties to it, namely, the father and the adopting father; and the observations of Lord Langdale as to what his decision would have been if the adopted child had lived long enough with the adopting father to form

expectations in life which ought not to be disappointed, were *obiter dicta* merely, though, of course, entitled to much respect, coming from a judge of such experience and reputation.

Nor is it necessary to dispute the proposition that there may be a valid engagement even by parol, made by persons living, a consideration having passed, which will operate as a disposition of the estate of one of them after his death. The decision of Lord Romilly, M. R., in *Ridley* v. *Ridley* (34 Beav. 478), lends the weight of the opinion of a very experienced equity judge to this proposition. Great difficulty, however, attends the admitting of such a principle, where such an engagement is sought to be enforced respecting land, and where, as in the case at bar, regard is had to the statute of frauds. Where such an engagement is by parol, it would seem on principle that two things must concur in order to entitle the plaintiff to relief: 1. That the contract was such a contract as could have been specifically enforced by the alleged adopting parent against the alleged adopted child and his real parents while the alleged adopting parent lived. 2. That the performance of the contract by the child and by his real parents was a performance with sole reference to the contract, and that the acts set up as performance were not acts which might, in whole or in part, be referable to some other circumstance or consideration.

This will appear from a recent judgment in the English court of appeal, in a case where the following facts appeared: The plaintiff, as heir at law of an intestate, claimed the title deeds of his farm, of which the defendant had taken possession at his death. The defendant set up, by way of counter-claim, that she was entitled to a life estate in the farm, and to retain the title deeds for her life. The jury found that the defendant had been induced to serve the intestate as his housekeeper without wages for many years, and to give up other prospects of establishment in life, by

his promise, which was a verbal one, to make a will leaving her a life estate in his farm, if and when it became his property. The court of appeal held, reversing the judgment of Mr. Justice Stephen, that neither the continuance of the defendant in the service of the intestate, nor the fact that he had executed a document which he intended to operate as a will in the defendant's favor, but which failed to take effect for want of proper attestation, was any evidence of a sufficient part performance of the parol agreement between the plaintiff and defendant, such as would take it out of the fourth section of the statute of frauds. In so holding, Bagally, L. J., speaking for the court, said: "It is a well recognized rule that if, in any particular case, the acts of part performance of a parol agreement as to an interest in land are to be held sufficient to exclude the operation of the statute of frauds, they must be such as are unequivocally referable to the agreement. In other words, there must be a necessary connection between the acts of part performance and the interest in the land which is the subject-matter of the agreement. It is not sufficient that the acts are consistent with the existence of such an agreement, or that they suggest or indicate the existence of some agreement, unless such agreement has reference to the subject-matter. As was said by Lord Hardwicke in *Gunter* v. *Halsey* (Ambler, 586), they must have been such as could have been done with no other view or design than to perform the agreement. Thus payment of a part, or even of the whole of the purchase-money, is not sufficient to exclude the operation of the statute, unless it is shown that the payment was made in respect of the particular land which is the subject of the parol agreement. On the other hand, the admission into possession of a stranger is, speaking in general terms, a sufficient part performance, for it is not explicable upon any other supposition than that it has resulted from the contract in respect of the land of which possession has been given. Again, the continuance in pos-

session of a tenant is not of itself a sufficient part perform-
ance of a parol agreement for the purchase from the landlord,
for it is equally consistent with a right depending upon his
tenancy.   Let us, then, apply this text to the acts of per-
formance relied on by the defendant in the present case.
They are limited to her continuance in the employment of
Thomas Alderson until his death without being paid the
wages due to her in 1860, and without receiving any remu-
neration for her subsequent services.   It can not with any
show of reason be contended that such continuance in his
service was referable only to an agreement that he would
leave her a life estate in his property, or, indeed, that it was
referable to any agreement whatever.   Other considerations
for the continued service suggest themselves, and, in par-
ticular, that to which we have already referred as having
been suggested by the plaintiff in argument, that the
defendant had been induced to continue in the service of
Thomas Alderson by an expectation, founded possibly upon
a representation made by him of his intentions, of some
future benefit to be derived under his will, should she
continue in his service.   The circumstance that Alderson
subsequently executed a document which he intended to
operate as a will in the defendant's favor, carries the case
no farther ; it is as consistent with the previous expressions
of intention as it is with his having previously entered into
an agreement, and it is equally consistent with his never
having done either the one or the other.   For the reason
that there is not in the present case any evidence of a suffi-
cient performance of the parol agreement upon which the
defendant's counter-claim is based, to exclude the operation
of the statute of frauds, we are of opinion that the plain-
tiff's appeal should be allowed."   *Alderson* v. *Maddison*,
7 Q. B. Div. 174.   The learned justice, speaking further
for the court, also expressed the opinion that the contract,
assuming it to have been made, was one which could not
have been enforced by either party to it during the life of

Thomas Alderson. "As regards the obligation upon the
defendant, it was a contract for personal services, for the
specific performance of which a decree could not be ob-
tained, though in some cases, as in that of *Lumley* v. *Gye*
(2 El. & Bl. 216), a court of equity would restrain by in-
junction the doing of an act contrary to the terms of the
agreement, and in that way obtain in substance a perform-
ance of it.   Nor could a court of equity, any more than a
court of law, compel a man to make a will in accordance
with any promise or agreement previously entered into by
him.   *   *   *   It appears to us that to give the same
effect to a man's promise or agreement to make a will,
as to a will made by him in pursuance of such promise or
agreement, would be in direct contravention of the provis-
ions of the statute."

This was a very recent case, decided in the year 1881.
So far as we know, it is the only decision by an English
court of appeal bearing upon the question before us.   It is
to be perceived that the party who claimed the benefit of
such an agreement failed, notwithstanding her case rested
upon clearer grounds than the case at bar.   She continued
for several years in the service of a man without compen-
sation; but, nevertheless, this was held not sufficient evi-
dence of part performance of the agreement set up by her
to take the case out of the statute of frauds, because her so
continuing in his service was not necessarily referable to
such an agreement.   So, in the case at bar, the plaintiff
continued in the service of Mr. and Mrs. McLaughlin dur-
ing the entire period of her minority after the age of four
years, and in the service of Mrs. McLaughlin for a number
of years thereafter.   But it is quite plain that her so con-
tinuing in their service is not necessarily referable to an
agreement that she should be adopted as their heir at law
and have the property of Mr. McLaughlin at his death.   It
is just as consistent with an agreement on their part to
raise and educate her, and with the feeling of affection and

filial obedience which she must have acquired for them during the long period in which they acted as her foster parents. Then, notwithstanding the decision of Chancellor Williamson, in *Van Dyne* v. *Vreeland* (*supra*), it is not clear that such a contract is one which is capable of specific enforcement under any circumstances. If the English court of appeal laid down the correct doctrine in *Alderson* v. *Maddison* (*supra*), it was not such a contract. Suppose the plaintiff had run away from Mr. and Mrs. McLaughlin on attaining the age of fourteen years, could they have reclaimed her custody and compelled her to live with them and render obedience and service to them? It is clear that they could not. The law does not give such a power to a father over his own child. It is quite clear, then, that the agreement set up in this petition was not such an agreement as a court of equity could have enforced specifically against the plaintiff at the suit of James McLaughlin in his lifetime, or Catherine McLaughlin after his death. Nor does it appear upon what principle the plaintiff could have had a specific enforcement of it in the lifetime of either James or Catherine McLaughlin. Upon what principle could she claim the specific enforcement of a contract as against them, which from its nature, they could not have specifically enforced against her? But it is perceived that this is just what the plaintiff is asking us to do, after the death of Catherine McLaughlin, and more than seven years after the death of James McLaughlin. Nor is it enough for her case that we should enforce an alleged parol contract of adoption. That, as we have seen, will not make out her case; for by adopting her, James McLaughlin did not oblige himself to make his will in her favor. We must go further, and enforce a parol promise on the part of James McLaughlin to make a will in her favor; but when was it ever decided that equity would compel specific performance of an agreement to make a will? There is no such thing known to the law as a parol will, with the isolated and narrow exception of a nuncupative will, and it is a well settled principle of

law, applied in England and America, that a nuncupative will, though valid to pass the personal estate of the decedent, is not valid as a devise of his real estate. But here, not even the formality surrounding a nuncupative will is claimed, — no testamentary announcement made to witnesses by a party *in extremis*, no reduction to writing of such testamentary announcement by such witnesses, and no exhibition and proof of the testament thus made for the purpose of probate.

It seems not necessary to pursue this subject further. The doctrine of estoppel is appealed to. This doctrine, it must be admitted, is sometimes carried to great length for the purposes of justice. Nor is it denied that it operates against privies in blood and estate, and that if it could have been invoked against James and Catherine McLaughlin while living, it can be invoked in respect of their real property against their heirs at law. But whatever may be said concerning this doctrine, it is clear that it can not be invoked for the purpose of overturning the whole policy of legislation touching the devolution of real property and of the estates of deceased persons.

The judgment of the circuit court is affirmed. All the judges concur.